## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHAUN TAYLOR, | | |
| Plaintiff, | | CIVIL ACTION NO. |
| | | 3:17-CV-43 (JCH) |
| v. | | |
| | | |
| NANCY E. BERRYHILL,[1] ACTING | | |
| COMMISSIONER OF SOCIAL | | |
| SECURITY, U.S.A., | | NOVEMBER 30, 2017 |
| Defendant. | | |

## RULING RE: CROSS MOTIONS TO REVERSE AND AFFIRM DECISION OF THE COMMISSIONER (DOC NOS. 14 & 16)

## I.    INTRODUCTION

Plaintiff Shaun Taylor ("Taylor") brings this action under title 42, section 405(g) of the United States Code, appealing from the final determination of the Commissioner of Social Security ("the Commissioner"), which denied his application for Title II disability insurance benefits and Title XVI supplemental security income.  Motion to Reverse the Decision of the Commissioner ("Pl.'s Mot.") (Doc. No. 14).  The Commissioner cross-moves for an order affirming that Decision.  Defendant's Motion for Judgment on the Pleadings ("Def.'s Mot.") (Doc. No. 16).

For the reasons set forth below, the Motion to Reverse the Decision of the Commissioner is **GRANTED**, and the Motion for Judgment on the Pleadings is **DENIED**. The case is remanded to the ALJ for proceedings consistent with this Ruling.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is hereby substituted as the defendant in this case, in place of the former Acting Commissioner of the Social Security Administration, Carolyn W. Colvin.  See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . resigns[ ] or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.").  The Clerk of Court is directed to correct the docket to reflect this substituted party.

## II.    PROCEDURAL HISTORY

Taylor first applied for social security disability benefits and supplemental security income on January 24, 2013.  In both applications, Taylor alleged disability beginning on January 1, 1994.[2]  Taylor's applications were denied initially on April 18, 2013, and upon reconsideration were denied again on August 20, 2013.  Taylor then filed a written request for a hearing on October 7, 2013, and that hearing took place before Administrative Law Judge ("ALJ") Matthew Kuperstein on March 3, 2015.  Taylor was represented at his hearing by Attorney Robert Reger.  During the hearing, Taylor himself testified, as did his stepfather, William Vandewarker, and a vocational expert, Joseph Goodman.  See Certified Transcript of Record ("R.") at 41–77 (transcript of hearing).

ALJ Kuperstein issued a written decision denying Taylor's applications on May 27, 2015.  Id. at 16–30 (decision).  With respect to Taylor's application for disability insurance benefits, ALJ Kuperstein found that Taylor had acquired sufficient quarters of coverage to remain insured through December 31, 2002, which means that, in order to prove eligibility for disability insurance benefits, Taylor would have to show that he has been disabled since December 31, 2002.  ALJ Kuperstein concluded that Taylor had not satisfied his burden in that respect.  See id. at 20.  Taylor does not dispute that finding.  See Plaintiff's Memorandum ("Pl.'s Mem.") (Doc. No. 15) at 9.

With respect to Taylor's application for supplemental income, ALJ Kuperstein concluded that Taylor was not engaged in substantial gainful activity, and further

---

[2] Taylor has not provided any explanation for the selection of January 1, 1994, and the record reflects that this date was selected in error.  See R. at 47 (testimony of Taylor that he "must have misread the paperwork or something and filled it out wrong").

concluded that Taylor suffered from two severe impairments: bipolar disorder and intermittent explosive disorder ("IED"). R. at 21–22. Although he considered Taylor's claim that he also suffered from anxiety disorder, ALJ Kuperstein concluded that anxiety disorder was not a severe impairment because "there are few objective findings concerning the claimant's anxiety, and there is no evidence that he meets the diagnostic criteria for an anxiety disorder." Id. at 22. ALJ Kuperstein found that Taylor's severe impairments did not equal the severity of listed impairments under title 20, section 404 of the United States Code.[3]

With respect to Taylor's residual functional capacity ("RFC"), ALJ Kuperstein concluded that Taylor could perform the full range of work at all exertional levels with the following non-exertional limitations: "he is limited to work that does not involve interaction with the general public, . . does not require the collaborative efforts of others to complete work activities," and "involves understanding, remembering, and carrying out simple instructions and making simple work-related decisions." R. at 24.

ALJ Kuperstein concluded that Taylor had no past relevant work. Id. at 28. He then concluded, based on Goodman's testimony, that Taylor could perform occupations such as packer, cleaner, or extrusion operator, id. at 28–29, and that these jobs "exist[ ] in significant numbers in the national economy," id. at 30. ALJ Kuperstein concluded

---

[3] In his Decision, ALJ Kuperstein assessed Taylor's impairments under listings 12.02 and 12.04. Listing 12.04 refers to bipolar disorder and similar disorders and was therefore properly considered. IED, however, should have been assessed under listing 12.08, which articulates the standard for evaluating personality and impulse-control disorders, as opposed to 12.02, which refers to neurocognitive disorders. However, ALJ Kuperstein's factual findings with respect to Taylor's severe impairments are sufficient to show that Taylor does not satisfy listing 12.08. Therefore, while ALJ Kuperstein analyzed Taylor's IED under the wrong listing, that error was harmless. Cf. Kohler v. Astrue, 546 F.3d 260, 267–68 (2d Cir. 2008) (error in analysis of severity of impairment was not harmless where "the decision contain[ed] no specific findings" regarding the applicant's limitations and therefore the reviewing court could not "determine whether there [was] substantial evidence for the ALJ's conclusion that Kohler's impairment, while severe, was not as severe as any listed disabling condition").

3

that Taylor was not disabled and denied his applications in full.  Id.

Taylor appealed ALJ Kuperstein's decision, and the Social Security Appeals Counsel denied his appeal on November 25, 2016, rendering ALJ Kuperstein's decision final and appealable to this court pursuant to title 42, section 405(g) of the United States Code.

## III.   RELEVANT FACTS

Taylor was born in January 1979, making him thirty-eight years old at the time of this Ruling.  He attended school through eleventh grade.[4]  See R. at 280.  Since leaving school in 1998, Taylor has worked sporadically in various part-time positions, including food service positions at several restaurants and maintenance work at a laundromat, and has done construction work for friends and family, but has never held a long-term job.  See id. at 242 (work history form submitted by Taylor); id. at 28 (decision of ALJ Kuperstein concluding that Taylor has no relevant work experience); id. at 57–58 (testimony of Taylor regarding his lack of work experience).

Taylor's medical evidence of record begins on October 20, 1999, and reflects that Taylor was diagnosed with opiate dependency and cannabis abuse.  See id. at 607–15.  The record reflects that Taylor has not used illicit drugs since at least 2003 when he began taking methadone.  See, e.g., id. at 552, 620.  Taylor has treated at the APT Foundation for addiction-related treatment as early as 2003, see id. at 616–61, and

_____

[4] At the hearing, Taylor testified that he only remembered attending school through seventh grade, but that Attorney Reger had received school records indicating that he had attended school through the eleventh grade.  R. at 53.  In Taylor's application for disability benefits, he recorded his last grade completed as eighth grade.  Id. at 242.  The record is further confused by medical records indicating that Taylor's highest grade completed was ninth grade, see id. at 617, and tenth grade, see id. at 613.  That said, the court does not consider Taylor's level of education material to this Ruling and therefore does not address it other than to note that the record is not clear on this issue.

the record indicates that he has treated regularly at the APT Foundation—including participating in group and individual therapy and receiving methadone—since at least 2012, see id. at 339–593. Taylor has earned the responsibility to take six bottles of methadone home with him at a time. See id. at 374, 380, 463.

An intake statement from the APT Foundation dated April 14, 2003, indicates that Taylor had been diagnosed with anxiety and bi-polar disorder by Dr. Patel at the Foxon Medical Center. Id. at 618. Treatment notes from the APT Foundation dated May 13, 2003, reflect that Taylor had been diagnosed with bipolar disorder and anxiety disorder, and was reporting "anxiety / panic and uncontrollable anger." Id. at 632. The treatment notes generally reflect a diagnosis of bipolar disorder, and they also reflect that Taylor reports symptoms consistent with social anxiety and generalized anxiety disorder. See id. at 434–593 (treatment notes from APT Foundation).

Taylor was first diagnosed with IED on October 21, 2013, as reflected in both treatment notes and a letter authored by Taylor's treating psychiatrist, Dr. Uzelia Louis-Jacques. R. at 538 (letter); id. at 577–78 (treatment notes). Subsequent treatment notes reflect this ongoing diagnosis. See, e.g., id. at 542, 545, 550, 554.

The record contains medical opinion evidence from four sources: treating psychiatrist Uzelia Louis-Jacques, treating psychiatrist Hassam Jefee-Bahloul, and state medical consultant psychologists Gregory Hanson and Thomas Hill.[5]

---

[5] ALJ Kuperstein gave little weight to all four of the medical source opinions in the record. Because Taylor does not challenge ALJ Kuperstein's determination with respect to the state medical consultants, the court does not address their opinions or ALJ Kuperstein's decision with respect to their opinions except to note that the court finds that ALJ Kuperstein's decision to accord their opinions little weight is supported by substantial evidence.

## IV. STANDARD OF REVIEW

Under title 42, section 405(g) of the United States Code, it is not the district court's function to determine de novo whether the claimant was disabled. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Instead, the court is limited to two lines of inquiry: whether the ALJ applied the correct legal standard, and whether the record contains "substantial evidence" to support his decision. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

## V. ANALYSIS

In his Motion to Reverse, Taylor asserts four bases upon which ALJ Kuperstein's decision should be reversed. First, Taylor argues that ALJ Kuperstein failed to give proper weight to the medical opinions of the two treating physicians who submitted medical opinions, Dr. Louis-Jacques and Dr. Jefee-Bahloul. Pl.'s Mem. at 12–14. Second, Taylor argues that ALJ Kuperstein ignored substantial evidence of Taylor's IED in making his RFC determination. Id. at 14. Third, Taylor argues that ALJ Kuperstein erred in giving little weight to the testimony of Taylor's stepfather. Id. at 14–15. Fourth, Taylor argues that ALJ Kuperstein's decision was not supported by substantial evidence. Id. at 15–16.

6

In addition, Taylor's Memorandum suggests he is raising several additional issues, though he does not expressly style them as claims, including: that ALJ Kuperstein erred in finding that anxiety disorder is not one of Taylor's severe impairments, that ALJ Kuperstein erred in his credibility determination with respect to Taylor's testimony, and that ALJ Kuperstein's RFC determination did not adequately take into consideration the functional limitations caused by IED. See infra Section V(B).

### A. ALJ Kuperstein Did Not Comply with the Treating Physician Rule

Taylor argues that ALJ Kuperstein failed to properly weigh the opinion testimony of his treating physicians, Drs. Louis-Jacques and Jefee-Bahloul. Pl.'s Mem. at 13. Taylor asserts that ALJ Kuperstein cited "no medical evidence" to support his conclusion, and that he placed too much weight on Taylor's testimony regarding his daily activities. Id. Taylor further asserts that the evidence with respect to Taylor's activities does not contradict Dr. Louis-Jacques's assessment and therefore was not a basis to give little weight to her opinion. Id.

The treating source rule requires that a treating source's medical opinion be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). Even if controlling weight is not given, "some weight may still be attached to that opinion, and the ALJ must still designate and explain the weight that is actually given to the opinion." Schupp v. Barnhart, No. 3:02CV103 (WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004); see also 20 C.F.R. § 416.927(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence . . . .").

When a medical opinion is not given controlling weight, title 20, section 416.927 of the Code of Federal Regulations ("section 416.927") mandates that ALJs consider the following factors in assigning weight to the medical opinion: (1) whether the provider has actually examined the claimant; (2) the treatment relationship, including the length, frequency of examination, and nature and extent of the relationship; (3) whether the provider presents relevant evidence to support his or her conclusions, particularly objective evidence; (4) the degree to which the provider's opinion is consistent with the medical record as a whole; (5) whether the provider is a specialist giving an opinion within his or her specialty; and (6) any other factors which support or contradict the provider's opinion. 20 C.F.R. § 416.927. Section 416.927 further provides, "We will always give good reasons in our notice of determination or decision for the weight we give [the] treating source's medical opinion."

1. Opinion of Dr. Jefee-Bahloul

In his medical source statement, Dr. Jefee-Bahloul reached the following conclusions: Taylor was mildly limited in his capacity to understand and remember simple instructions; moderately limited in his ability to carry out simple instructions and to make judgments on simple work-related decisions; markedly limited in his capacity to understand and remember complex instructions; and extremely limited in his ability to carry out complex instructions and make judgments on complex work-related decisions. R. at 604. Dr. Jefee-Bahloul noted in this section that "on cognitive testing patient exhibits significant impairment in concentration when asked to do serial 7's or spell

WORLD backwards. Also patient has issues w/ memory. Cognitive testing exhibits impairment in abstract thinking and judgment." Id. Dr. Jefee-Bahloul further found that Taylor was markedly limited in his capacity to interact appropriately with the public, supervisors, or co-workers, and markedly limited in his capacity to "[r]espond appropriately to usual work situations and to changes in a routine work setting." Id. at 605. Dr. Jefee-Bahloul noted, "In a previous work situation, patient's anger, impulsivity caused him to be aggressive, for example throwing a knife in a kitchen." Id. Dr. Jefee-Bahloul also notes, "Given [Taylor's] concrete thinking process, patient can't tolerate any changes in life structure which may lead to exacerbation of mood symptoms." Id.

In according Dr. Jefee-Bahloul's opinion little weight, ALJ Kuperstein acknowledged that Taylor "has been diagnosed with bipolar disorder and intermittent explosive disorder" and "has stated that these problems prevent him from sustaining attention and concentration for extended periods." Id. at 27. ALJ Kuperstein further noted, "Mental status examinations reveal intermittent disturbances in mood and affect, which likely prevent him from performing complex work activities, as Dr. Jefee-Bahloul finds." Id. Despite these findings, ALJ Kuperstein broadly asserted that Dr. Jefee-Bahloul's other conclusions are "not consistent with the medical evidence, including his own treatment notes." Id. He did not, however, cite to any medical evidence to support this assertion.

The Commissioner asserts that ALJ Kuperstein's decision was supported by medical evidence, albeit evidence that was cited elsewhere in ALJ Kuperstein's opinion as opposed to the treating physician opinion analysis. See Defendant's Memorandum ("Def.'s Mem.") (Doc. No. 16-1) at 10. However, the Commissioner has failed to direct

the court to any evidence cited elsewhere that actually does support ALJ Kuperstein's decision. For example, the Commissioner argues that Dr. Jefee-Bahloul's opinion about Taylor's ability to interact with the public is contradicted by treatment notes, <u>see</u> Defendant's Memoradum at 10–11, but ALJ Kuperstein actually <u>agreed</u> with Dr. Jefee-Bahloul about this limitation. R. at 27 ("The medical evidences supports the restrictions Dr. Jefee-Bahloul describes in the claimant's abilities to perform complex tasks and interact with the public . . . ."). Therefore, even assuming that the court can treat evidence cited elsewhere as support for an ALJ's treating physician determination, the Commissioner has failed to cite any medical evidence cited elsewhere by ALJ Kuperstein that supports his decision with respect to treating physician opinion evidence.

With respect to Dr. Jefee-Bahloul's conclusions that Taylor was mildly limited in his ability to understand and remember simple work instructions and moderately limited in his ability to carry out simple work tasks and make judgments about simple work tasks, ALJ Kuperstein found that Taylor's ability to "prepare simple meals, manage his own medications, shop, and pay his own bills" implies that Taylor "is less limited . . . than Dr. Jefee-Bahloul indicates." <u>Id.</u> However, Dr. Jefee-Bahloul's conclusions of mild and moderate limitations in these areas are simply not refuted by Taylor's daily activities. On the medical source statement form completed by Dr. Jefee-Bahloul (a form produced by the Social Security Administration), a "mild" limitation is defined as "a slight limitation" with which "the individual can generally function well" and a "moderate" limitation is defined as "more than a slight limitation in this area but the individual is still

able to function satisfactorily.'[6]  R. at 604.  Given that even a moderate limitation allows

for "satisfactor[y]" functioning, Taylor's quite limited daily activities simply do not

undermine Dr. Jefee-Bahloul's medical opinion.  Cf. Quinones on Behalf of Quinones v.

Chater, 117 F.3d 29, 35 (2d Cir. 1997) (rejecting ALJ's daily-activities explanation on

the ground that while "these activities suggest that Jennifer is 'sometimes' able to

complete simple, age-appropriate tasks, they do not refute [evidence] that Jennifer has

'constant' difficulty in completing both simple and complex age-appropriate tasks").

ALJ Kuperstein also disagreed with Dr. Jefee-Bahloul's opinion with respect to

Taylor's ability to "respond to usual work settings and change."  R. at 27.  First, ALJ

Kuperstein noted that "the evidence establishes that [Taylor] tolerates life stressors

without an increase in objective mental status abnormalities."  Id.  ALJ Kuperstein does

not cite any record evidence to support this statement, nor does he define what an

"objective mental status abnormality" is.  Yet, at the hearing, Taylor offered

uncontroverted testimony that he suffers from explosive rage that has led him to, among

other things, put his head through a car window, throw a butcher knife across a kitchen

at work, and challenge a supervisor to a fight.  See id. at 61–62.  The knife throwing

incident was, as described above, expressly referenced by Dr. Jefee-Bahloul in his

medical source statement.  Id. at 605.  In addition, outbursts of rage are the defining

features of IED, a condition that ALJ Kuperstein found was a severe impairment in his

---

[6] In its Memorandum in Support of its Motion to Affirm, the Commissioner characterizes Dr.
Jefee-Bahloul's opinion as finding that Taylor has "severe mental limitations." Def.'s Mem. (Doc. No.
16-1) at 11.  "Severe" is not one of the options on the form that Dr. Jefee-Bahloul completed, but
presumably a "severe" limitation would be more akin to a marked or extreme limitation than the mild and
moderate limitations that Dr. Jefee-Bahloul identified.

Decision.[7]  The court therefore concludes that ALJ Kuperstein's finding that Taylor

"tolerates life stressors without an increase in objective mental status abnormalities" not

only is not supported by substantial evidence but is, in fact, plainly contradicted by the

record.

ALJ Kuperstein disagreed with Dr. Jefee-Bahloul's opinion that Taylor is

markedly limited in his capacity to interact with coworkers and supervisors on the

ground that Taylor "has friends,[8] shops, spends time with family, and gets along well

with treatment providers."  Id.  The medical source form that Dr. Jefee-Bahloul

completed defines "marked" limitation as "a substantial loss in the ability to effectively

function."  Id. at 604.  As noted above, in support of his findings Dr. Jefee-Bahloul

specifically cited Taylor's outbursts of rage, including throwing a knife across a kitchen.

Id. at 605.  Therefore, the record is clear that Dr. Jefee-Bahloul based his medical

opinion on Taylor's IED, a medical condition that, as aforementioned, ALJ Kuperstein

found to be a "severe impairment" of Taylor.  Dr. Jefee-Bahloul's opinion that Taylor's

IED creates marked limitations in his ability to interact with coworkers and supervisors is

therefore not refuted by the fact that Taylor is generally pleasant around treatment

---

[7] It is also worth noting that ALJ Kuperstein's decision reflects that he would not have made that finding lightly.  For example, although Taylor asserted that he suffered from anxiety disorder as well as bipolar disorder and IED, ALJ Kuperstein declined to find that Taylor suffered from anxiety disorder because "the record must contain medical evidence consisting of signs, symptoms, and laboratory findings to support" a claimant's statement that he suffers from a disorder.  R. at 22.

[8] Although he does not cite to the record to support his finding that Taylor has friends, ALJ Kuperstein is presumably relying on the testimony of Taylor's stepfather, William Vandewarker, whose testimony is the only evidence that could even arguably support such a finding.  Vandewarker testified that Taylor never has friends over at the house, although he occasionally "associates with some of [his sister's] friends, but not on the outside, always inside the house."  R. at 67.  When asked whether Taylor left the house to visit friends, Vandewarker answered, "No, not really.  He goes and visits his brother or whatever, but that's, that's about it."  Id.  The record, therefore, does not suggest that Taylor has an active social life.

providers, socializes with friends, and has relationships with family members. Indeed, Taylor has specifically experienced problems in work settings, most notably the knife-throwing incident. <u>See</u> <u>id.</u> at 605.

ALJ Kuperstein not only decided not to give Dr. Jefee-Bahloul's opinion controlling weight, but also decided his opinion was entitled to "little weight" overall. <u>Id.</u> at 27. However, the section 416.927 factors generally militate in favor of giving Dr. Jefee-Bahloul's opinion substantial weight. For example, Dr. Jefee-Bahloul was a treating physician who was seeing Taylor regularly at the time his medical source statement was completed. <u>See</u> <u>id.</u> at 540–54. As a psychiatrist, Dr. Jefee-Bahloul is a specialist providing opinions within his area of specialization. <u>See</u> <u>id.</u> at 606. Finally, Dr. Jefee-Bahloul supported his opinions with references to cognitive testing, Taylor's diagnoses, and Taylor's history. <u>Id.</u> at 604–05.

In sum, the evidence cited by ALJ Kuperstein does not refute Dr. Jefee-Bahloul's opinion and therefore does not support ALJ Kuperstein's decision. The court therefore concludes that ALJ Kuperstein's determination that Dr. Jefee-Bahloul's medical source statement was not entitled to controlling weight was not supported by substantial evidence.

2. Opinion of Dr. Louis-Jacques

Unlike Dr. Jefee-Bahloul, who completed a medical source statement form, Dr. Louis-Jacques submitted a letter, dated October 21, 2013, containing her opinion of Taylor's work-related capacity. R. at 538. In that letter, Dr. Louis-Jacques noted that she had been Taylor's treating psychiatrist since August 5, 2013, and that she had reviewed the treatment notes of Taylor's former treating psychiatrist, Dr. Teo-Carlo

Straun.  Id.  Dr. Louis-Jacques then discussed Taylor's diagnoses:

> [I]t is clear [Taylor] has a diagnosis of Bipolar I Disorder which in the manic and depressive phases does cause significant impairment from working.  However he also has an additional diagnosis of Intermittent Explosive Disorder.  Which can present itself at any time and is characterized by low frustration tolerance, impulsivity, an [sic] inappropriate anger / aggression.

Id.  Dr. Louis-Jacques went on to state that Taylor's conditions were improving with treatment, but opined that he should engage in part-time, as opposed to full-time, work because "the demands of full time work have been shown [sic] exacerbate his mental illness and could result in an acute deterioration from his present mental status."  Id.

On the subject of Taylor's capacity to work full-time, treatment notes authored by Dr. Louis-Jacques provide additional context.  For example, in a note dated October 7, 2013, Dr. Louis-Jacques states that Taylor "just fell off roof on Friday" and explains:

> When [Taylor] was working on the roof he went into a manic state and that is why he fell off the roof.  He describes manic states as energy level going up, not focused on things he is doing, and he feels full throttle like things go full out there for him, and that his thoughts race and he gets easily irritated and frustrated if working on shingles or a car he feels like he cannot stop he will do it until he gets irritated and has to stop or else he will flip out.

Id. at 578.  In addition to the details related to falling off the roof, Dr. Louis-Jacques notes that Taylor "[h]as put [his] head through a window in the past, [and] has a long history of fights that were relatively unprovoked."  Id.  She also notes that Taylor "has very abrupt mood changes . . . like a switch."  Id.  In another note from a session that took place on September 23, 2013, Dr. Louis-Jacques states that Taylor "[c]ouldn't work before because he was manic having racing thoughts, or other times would be in the wrong frame of mind, threw a knife into a kitchen while at work because he was

'manicky' feels like when he's kind of manic and then he works he ends up getting edgy and irritable, he can't ride a bus and has trouble being around a lot of people." Id. at 582.

ALJ Kuperstein acknowledged that Dr. Louis-Jacques "treated the claimant for several years," but concluded that her opinion "is not consistent with the medical evidence, which establishes that the claimant is capable of performing work activities on a regular and continuing basis for the reasons explained above."[9] Id. at 27. It is not clear what ALJ Kuperstein means by "explained above," although his analysis with respect to Dr. Louis-Jacques directly follows his analysis with respect to Dr. Jefee-Bahloul, so that may be the analysis to which he refers. Upon review of the record as a whole, the court is aware of no medical evidence that suggests that Taylor is "capable of performing work activities on a regular and continuing basis," and he does not provide any citations to support this conclusion. In fact, the only medical evidence of record that explicitly refers to Taylor's capacity to work is the medical opinion evidence (to which ALJ Kuperstein assigned "little weight") and the treatment notes by Dr. Louis-Jacques quoted above.

Assuming that ALJ Kuperstein's reference "medical evidence" was, in fact, intended to reference the treatment notes and lay testimony related to Taylor's daily activities, the court is unaware of any evidence that Taylor is "capable of performing work activities on a regular and continuing basis." Although there is evidence that

---

[9] Although it is not clear what ALJ Kuperstein means by "performing work activities on a regular and continuing basis," the court construes him to mean performing full-time work, given that ALJ Kuperstein made this finding in the context of supporting his decision to give little weight to Dr. Louis-Jacques's opinion that Taylor cannot perform full-time work.

Taylor can perform simple tasks—including going to the gym, preparing simple meals, shopping, and cleaning—there is no evidence that he can work for eight hours in a row without becoming manic or frustrated, causing him to have accidents or fly into a rage. Notably, Dr. Louis-Jacques did not opine that Taylor could not work full-time because he was incapable of performing basic work tasks, which would be undermined by Taylor's ability to engage in activities like meal preparation and shopping, but rather that sustained periods of work exacerbated his mental health problems. In short, none of the evidence, medical or otherwise, refutes this opinion of Dr. Louis-Jacques.

ALJ Kuperstein also justifies his decision to give little weight to Dr. Louis-Jacques's opinion on the basis that her letter is "vague, and fails to explain specifically what the claimant remains able to do despite his impairments." Id. at 27. This criticism is belied by the plain language of the opinion itself, which does state what Taylor can do—part-time work, but not full-time work—and provides the diagnoses and symptoms that inhibit his ability to do full-time work. See R. at 538.

In defense of ALJ Kuperstein's conclusion, the Commissioner cites section 416.927(a)(1) for the proposition that medical opinions "must reflect judgments about what a claimant can still do despite his or her impairments." Def.'s Mem. at 12. Section 416.927(a)(1) defines medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Section 416.927(a)(1). The court is not convinced that this provision, which simply defines medical opinions, mandates that all medical opinion evidence contain all the information listed. In any

event, as stated above, Dr. Louis-Jacques's letter <u>does</u> state what Taylor "remains able to do": part-time work.  The court is, therefore, unpersuaded by this argument.

In addition, like Dr. Jefee-Bahloul, the section 416.927 factors tend to show that Dr. Louis-Jacques's opinion should have been accorded more than the "little weight" that ALJ Kuperstein gave it.  <u>See</u> R. at 27.  Like Dr. Jefee-Bahloul, Dr. Louis-Jacques was Taylor's treating physician at the time that she authored her opinion, <u>id.</u> at 538, and is a psychiatrist opining within her area of specialty, <u>id.</u> at 27.  Her opinion is also supported by her treatment notes and is consistent with the treatment notes and medical source statement authored by Dr. Jefee-Bahloul.  <u>See id.</u> at 555–82 (treatment notes by Dr. Louis-Jacques); <u>id.</u> at 540–54 (treatment notes by Dr. Jefee-Bahloul); <u>id.</u> at 604–06 (medical source statement by Dr. Jefee-Bahloul).

For the foregoing reasons, the court concludes that ALJ Kuperstein's decision with respect to Dr. Louis-Jacques's opinion was not supported by substantial evidence.

### 3.  Remand

In light of the court's conclusion that ALJ Kuperstein erred in his application of the treating physician rule with respect to both Dr. Jefee-Bahloul and Dr. Louis-Jacques, the court concludes that this case should be remanded to the ALJ to reassess the opinion evidence consistent with this Ruling.  In deciding to remand, the court is cognizant of the fact that, if "application of the correct legal standard could lead to only one conclusion," the court need not remand.  <u>See</u> <u>Schaal</u>, 134 F.3d at 504; <u>id.</u> at 505 (remanding because "application of the correct standard does not lead inexorably to a single conclusion").  It is a close question, in this case, whether remand to the ALJ for further analysis is appropriate, or merely for calculation of benefits.  <u>See</u> <u>Rosa</u>, 168 F.3d

at 83 ("[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for calculation of benefits."). Based on the record currently before the court, the court is of the view that application of the treating physician rule to the opinions of Dr. Jefee-Bahloul and Dr. Louis-Jacques are entitled to controlling weight. However, the court cannot say with certainty "whether further clarification of the record" pursuant to the court's Ruling would "alter the weighing of the evidence." Schaal, 134 F.3d at 504. The court is mindful of the fact that "[i]t is for the [Social Security Administration], and not this court, to weigh the conflicting evidence in the record." Id.

In addition, even if the ALJ determines, on remand, that either or both of Taylor's treating physicians is entitled to controlling weight, that does not necessarily mean that Taylor is disabled. Neither Dr. Louis-Jacques nor Dr. Jefee-Bahloul opined that Taylor could not do any work. The vocational expert, Joseph Goodman, did testify that someone with Taylor's RFC, as described by ALJ Kuperstein in his first hypothetical (and subsequently reflected in his decision), who had explosive angry outbursts two or three times per month would be unable to do any work. R. at 74. However, while the medical opinion evidence of Taylor's treating physicians suggests that Taylor may have such outbursts two or three times a month (or more), neither Dr. Louis-Jacques nor Dr. Jefee-Bahloul explicitly stated as much, and ALJ Kuperstein made no such factual finding. Therefore, remand is proper both to reweigh the treating physician opinion evidence and also to apply that evidence to the RFC determination and, consequently, to the existing vocational evidence or development of additional vocational evidence.

The decision of the Social Security Administration is hereby vacated and this

case is remanded to the Commissioner for further proceedings consistent with this opinion.

      B.    <u>Additional Issues</u>

In light of the court's decision to remand this case on the issue of the treating physician evidence, the court need not reach the merits of Taylor's other claims. However, having reviewed the record and Taylor's arguments, as well as the Commissioner's responses, the court addresses several additional issues.

As a threshold matter, the court observes that, with the exception of his claim pursuant to the treating physician rule, Taylor's Memorandum is rather muddled.  For example, Taylor references his own hearing testimony as support for several of his arguments, <u>see</u> Pl.'s Mem. at 16, but does not argue that ALJ Kuperstein erred in his credibility determination of Taylor's testimony, namely that Taylor's "symptoms are not as severe or as limiting as he claims."  R. at 26.  Similarly, Taylor asserts that ALJ Kuperstein erred in failing to consider Goodman's testimony that Taylor could not do any work if he had outbursts of anger two to three times per month, but does not make the argument that ALJ Kuperstein's RFC determination was incorrect, which this court considers a necessary prerequisite to challenging the vocational evidence under the circumstances present in this case.  Nevertheless, because this case is being remanded for further analysis by the ALJ, in the interest of judicial efficiency the court considers the claims raised by Taylor as well as claims the court has identified upon review of the record.  <u>See</u> <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000) (reviewing court should "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the

Commissioner's decision and if the correct legal standard have been applied"); cf.

Hubbard v. Comm'r of Soc. Sec., 6:14-CV-1401(GTS/WBC), 2016 WL 551783, at *4

(N.D.N.Y. Jan. 14, 2016) (examining the record "to determine whether the ALJ applied

the correct legal standards and reached a decision based on substantial evidence"

despite the plaintiff's failure to file a brief) adopted by 6:14-CV-1401 (GTS/WBC) 2016

WL 590226 (N.D.N.Y. Feb. 11, 2016).

1. ALJ Kuperstein's Credibility Determination of Taylor's Testimony

At the hearing, Taylor testified that his outbursts of anger had resulted in him

repeatedly losing jobs.

> The last job I did have I ended up getting fired because the
> boss said something and I ended up threatening him and I got
> fired from that job.  And then the last job before that I was
> working and I was doing prep cooking and one of the
> waitresses got nasty with me and I thought I has something
> else but I had a butcher knife and I threw it through the
> kitchen, good thing I didn't stab nobody.

R. at 52.  He further testified that, although he had obtained work "maybe a day or two

here and there," the positions were short-lived because "they just couldn't tolerate me."

Id. at 53.  Asked whether, in addition to the knife throwing incident, he had had other

issues at work as a result of his anger problems, Taylor responded affirmatively:

> When I was working at Friendly's, I threatened a manager to
> go outside I was going to, excuse my language, kick his ass,
> but he said, yeah, and then when I went outside he locked the
> door so I couldn't come back in.  And there's been other
> instances where just little things here and there somebody
> questioned me and I knew I was right, I would get very angry
> and just go off the wall.  I would scream, yell, throw things,
> punch things, I mean.

Id. at 61.  Taylor testified that since he had been diagnosed with IED, and received

medication, he suffered from fewer outbursts.  However, he testified that he still had

20

outbursts approximately six or seven times per month.  Id. at 62.  Taylor also testified

that he does not drive because he is afraid that he would get angry while driving and

hurt someone.  Id. at 52.

In his decision, ALJ Kuperstein recognized that Taylor suffers from IED, which

causes these outbursts.[10]  He also noted that mental status examinations "do

sometimes reveal disturbances in mood and affect."  Id. at 26.  Nevertheless, ALJ

Kuperstein concluded that Taylor's testimony with respect to his limitations was not

"fully support[ed]" by the evidence.  Id.  In support of this conclusion, ALJ Kuperstein

cited the following medical evidence:

> Treatment providers routinely fail to describe deficits in
> attention, concentration, or memory during appointments, and
> the claimant is often described as "pleasant."  In addition,
> while the claimant has received regular treatment for his
> impairments, this has been quite conservative.  He has not
> required any type of intensive inpatient or outpatient care to
> help manage his symptoms.

Id. (internal citations omitted).  None of this evidence refutes Taylor's testimony that,

because of his periodic angry outbursts, he is unable to maintain a job.

First of all, with respect to Taylor's "pleasant" demeanor, IED is—as evidenced

by the name of the disorder alone—defined by intermittent outbursts.  Therefore, the

fact that Taylor is frequently described as pleasant by treatment providers does not

refute his own testimony (not to mention the diagnosis of his treating psychiatrists) that

he suffers from intermittent explosions of anger.  Cf. Quinones, 117 F.3d at 35

---

[10] According to the DSM-5, IED is marked by "[r]ecurrent behavioral outbursts" that are "grossly
out of proportion to the provocation or to any precipitating psychosocial stressors," are neither
premeditated nor committed to achieve some tangible objective, and commonly cause impairment in,
among other things, occupational functioning.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of
Mental Disorders (5th ed. 2013).

(evidence of plaintiff's "intelligence, imagination, social skills, bright demeanor, and maturity" was "simply irrelevant" to plaintiff's "concentration, persistence, and pace").

Second, the bare fact that Taylor's treatment has not involved "intensive inpatient or outpatient care" does not mean Taylor is not disabled. As a threshold matter, Taylor's medical record reflects that he takes three different medications—Depakote, Trazodone, and Valium—to treat his mental health issues (in addition to methadone), and participates in prescribed psychotherapy. See R. at 540–92 (treatment notes by Drs. Louis-Jacques and Jefee-Bahloul). Psychiatrists have also recommended individual and group therapy, cognitive behavioral therapy, and acupuncture. See, e.g., id. at 586. The court is skeptical that this treatment regimen can reasonably be termed "conservative." However, even assuming that Taylor's treatment regimen is conservative, neither ALJ Kuperstein nor the court has sufficient information to infer from that that Taylor's testimony lacks credibility. See Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (conservative treatment regimen did not contradict physician's opinion that claimant was disabled); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000) (district court and ALJ erred in "impos[ing] their notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered"). For instance, the record does not contain any evidence regarding the normal course of treatment for IED, whether intensive inpatient or outpatient treatment is common or recommended, or even whether the condition can be treated at all. Thus, the record does not support an inference that the absence of intensive in- or outpatient treatment suggests that Taylor is overstating the severity of his symptoms.

In support of his credibility determination, ALJ Kuperstein also cites Taylor's daily

activities, including that "he is able to care for his personal needs, prepare simple meals, shop, pay his own bills, spend time with friends and family, and handle his own methadone treatment." R. at 26. ALJ Kuperstein also notes that, as treatment records reflect, Taylor "goes to the gym regularly, cleans the house, has held several part time jobs, and does construction work for his friends and family." Id. However, these daily activities simply do not refute Taylor's testimony that, because he sporadically explodes in rage, he cannot maintain a full-time job.

Of these activities the only ones that even remotely suggest that Taylor may be overstating the impact of IED are that he "spends time with friends and family," that he "goes to the gym regularly," and that he "has held several part time jobs." Yet none of these can bear the weight that ALJ Kuperstein places on them. As the Commissioner acknowledges in its Memorandum, Defendant's Memorandum at 12, the "friends" to which ALJ Kuperstein refers are, in fact, Taylor's sister's friends, with whom Taylor occasionally socializes when they are at his house. R. at 67; see supra note 8. As for Taylor's family relationships, it ought to go without saying that family members—particularly immediate family members—are likely to understand and forgive much more than an employer would.

Although Taylor's treatment notes do reflect that he goes to the gym with some regularity, that, too, does not undermine his testimony that he is unable to hold a job because of his explosive outbursts. First, there is no reason to believe that Taylor spends all day at the gym, comparable to a full-time job. In light of the medical opinion evidence that full-time work exacerbates Taylor's mental health status, see R. at 538, that distinction is significant. Furthermore, unlike in a work setting where Taylor would

have to interact with supervisors and coworkers, exercising ordinarily does not require taking orders, building relationships, or resolving conflicts.[11]  To the extent that exercising at a gym requires interacting with others appropriately, the social demands of a gym are much lower than in a work setting.  Finally, the record is devoid of evidence as to Taylor's ability to act appropriately at the gym.  It may be that Taylor has suffered outbursts at the gym but has nevertheless been permitted to return, or that he has suffered outbursts and not been permitted to return.  In short, going to the gym cannot be equated to holding a full-time job, and that activity evidence therefore does not undermine Taylor's testimony.

With respect to ALJ Kuperstein's assertion that Taylor "has held several part time jobs," the record reflects that Taylor has been hired into part time jobs at various points in his adulthood, but has not retained any of those positions.  For example, his earnings summary reflects that between 2003 and 2013, Taylor earned money in only 2011, and then only earned $531.25.  Id. at 222.  His best earning year was 2000—which was, notably, more than a decade before he was diagnosed with IED—and even then he earned only $4,571.14.  Id.  Taylor's testimony was entirely consistent with this part-time work history, and ALJ Kuperstein did not cite any evidence to the contrary.

For the foregoing reasons, the court concludes that ALJ Kuperstein's credibility determination with respect to Taylor was not supported by substantial evidence.

     2.  ALJ Kuperstein's Credibility Determination of Vandewarker's Testimony

Taylor's stepfather, William Vandewarker, who has lived with Taylor since Taylor

---

[11] While membership on a sports team or work with a personal trainer may make such demands, there is no evidence that Taylor is engaged in these activities.

was nine years old, testified to Taylor's anger problems as well. Vandewarker estimated that he observes Taylor's angry outbursts approximately "three or four times in a month." Id. at 70. He testified that when Taylor gets angry "he'll throw something or he'll hit something." Id. at 71. Vandewarker testified that he has "seen [Taylor] punch walls, punch doors and when he's in, when he's in a case like that it's, it's quite difficult to calm him down." Id.

ALJ Kuperstein did not credit Vandewarker's testimony, for the same reasons that he did not credit Taylor's testimony. Id. at 26. For the same reasons cited with respect to Taylor's testimony, the record evidence does not conflict with Vandewarker's testimony, and therefore does not constitute substantial evidence to support ALJ Kuperstein's credibility determination with respect to Vandewarker.

ALJ Kuperstein also cited two additional reasons to discredit Vandewarker's testimony: (1) Vandewarker "is not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms" and (2) "by virtue of their [sic] relationship with the claimant, he cannot be considered a disinterested third party witness whose testimony would not tend to be colored by affection for the claimant." Id. at 26.

With respect to Vandewarker's lack of medical training, Taylor argues in his Memorandum that it is error to discredit lay testimony on the basis that the witness lacks medical training. See Pl.'s Mem. at 15. The court agrees with Taylor that Vandewarker's testimony, which reflected his own observations from living with Taylor, is not diminished by his lack of medical expertise. See Singletary v. Sec'y of Health,

Ed. & Welfare, 623 F.2d 217, 219 (2d Cir. 1980) (holding that it was error for ALJ to reject testimony of claimant's son on the ground that the son "is not a doctor").

With respect to ALJ Kuperstein's finding that Vandewarker's testimony was "colored by affection for the claimant," the court concludes that this explanation does not constitute substantial evidence upon which to discount Vandewarker's testimony.  Lay testimony by corroborating witnesses is welcomed by the Social Security regulations and interpreting case law.   See 20 C.F.R. § 416.913(4); Lopez v. Sec'y of Dept. of Health & Human Servs., 728 F.2d 148, 150 (2d Cir. 1984) (ALJ erred in failing to take testimony of lay witness who "apparently has regular contact with appellant" and "could have provided effective testimony about appellant's inability to function on a daily basis").  The Ninth Circuit has gone so far as to hold that corroborating lay witness testimony cannot be rejected on the basis that the witness is a family member.  See Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996).  Although the Second Circuit has not adopted a per se rule on this issue as the Ninth Circuit has, the Second Circuit has routinely treated family member testimony as valuable evidence.  See e.g., Williams, 859 F.2d at 261; Singletary, 623 F.2d at 219.  Given that the claimants themselves generally have the largest incentive to overstate the symptoms of a condition, it makes little sense to accept claimant testimony but reject testimony of claimants' family members on that basis.

That is not to say that, had ALJ Kuperstein otherwise found Vandewarker's testimony incredible, he could not have attributed that to Vandewarker's relationship with Taylor.  See Singletary, 623 F.2d at 219 (acknowledging that "possible bias" of claimant's son "is undoubtedly a factor which would go to the weight of the son's

testimony"). Rather, where, as here, a lay witness testifies to his personal experience with symptoms that are consistent with the claimant's diagnosis and the opinions of his treating physicians, the mere fact that Vandewarker cares about his stepson does not constitute substantial evidence upon which to reject his testimony. See Williams, 859 F.2d at 261 (holding that ALJ erred in failing to consider lay testimony where "the subjective testimony of pain and disability given by claimant and her mother is consistent with the objective medical facts and the experts' opinions"). If it was ALJ Kuperstein's intent, in citing Vandewarker's relationship with Taylor, to corroborate a finding of bias on other grounds than those stated in his opinion, he failed to provide adequate information for the reviewing court. See id. at 260–61 ("A finding that a witness is not credible must . . . be set forth with sufficient specificity to permit plenary review of the record."). Having concluded that ALJ Kuperstein's other explanations for his rejection of Vandewarker's testimony do not support that decision, the court finds that Vandewarker's relationship with Taylor alone does not constitute substantial relevant evidence.

In sum, while ALJ Kuperstein provided several reasons for his decision to give Vandewarker's testimony "little weight," this decision was nevertheless not supported by substantial evidence.

### 3. Physician Opinion and Lay Testimony Evidence Is Relevant to RFC Determination

In making his RFC determination, ALJ Kuperstein took Taylor's IED into account by finding that Taylor could not do work that involves "interaction with the general public" or work that "require[s] the collaborative efforts of others to complete work activities." R. at 24. ALJ Kuperstein did not, however, factor in Dr. Jefee-Bahloul's

opinion that Taylor has marked limitations in interacting with coworkers or supervisors, Dr. Louis-Jacques's opinion that working full-time would exacerbate Taylor's mental health status, Taylor's testimony regarding his being fired for explosive outbursts, or Vandewarker's testimony about the kind of destructive behavior that Taylor engages in during his angry outbursts. All of that evidence is relevant to Taylor's nonexertional limitations. Rosa, 168 F.3d at 78 n.2 ("A nonexertional limitation is one imposed by the claimant's impairments that affect [his] ability to meet the requirements of jobs other than strength demands . . . ."). ALJ Kuperstein should, therefore, revisit his RFC determination alongside revisiting his analysis of the medical opinion evidence and the lay testimony.

4. RFC Determination Is Relevant to Vocational Expert Testimony

At Taylor's hearing, vocational expert Joseph Goodman ("Goodman") testified. ALJ Kuperstein asked Goodman two hypothetical questions. First, ALJ Kuperstein asked Goodman what work could be done by an individual who is "limited to work that does not involve any interaction with . . . the general public and does not require the collaborative efforts of others in completing work activities" as well as "limited to work that involves understanding, remember and carrying out simple instructions and then making simple work related decisions." R. at 72. Goodman replied that such an individual would be able to perform positions such as packer, cleaner, and extrusion operator. Id. at 73. ALJ Kuperstein then inquired as to whether those positions could be performed by someone who needed to be off task for more than ten percent of an eight-hour work day. Goodman answered that someone who needed to be off-task for more than ten percent of a workday "would be precluded from all work." Id.

28

After ALJ Kuperstein concluded his questions for Goodman, Attorney Reger asked Goodman to clarify whether someone in the positions he listed would have contact with supervisors, to which Goodman replied affirmatively.  Id. at 74.  Then Attorney Reger asked Goodman whether someone who has "explosive outbursts where he might throw things, swear at people, completely lose his temper" two or three times per month could do any of the positions listed.  Id.  Goodman responded, "It's not in the DOT but my opinion based on work in the field would say, no, this person would be unable to maintain any work."  Id.

In his written Decision, ALJ Kuperstein relied on Goodman's testimony to find that "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  Id. at 28.  In so doing, he cited Goodman's response to his first hypothetical that, given Taylor's RFC as defined by ALJ Kuperstein, Taylor could be a packer, a cleaner, or an extrusion operator.  Id.  ALJ Kuperstein did not mention Goodman's testimony that, if Taylor had two or three explosive outbursts per month, Taylor "would be unable to maintain any work."

Taylor's Memorandum suggests that it was error for ALJ Kuperstein not to consider Goodman's testimony about the lack of available jobs for someone with Taylor's RFC who also suffered from explosive outbursts two or three times per month.  "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved."  Calabrese v. Astrue, 358 Fed. App'x 274, 276 (2d Cir. 2009).  However, "[t]he vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and

capabilities, can realistically perform a particular job." Aubeauf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981). Although a hypothetical "need not frame the claimant's impairments in the specific diagnostic terms used in the medical reports," it nevertheless must "capture the concrete consequences of those impairments." Calabrese, 358 Fed. App'x at 277 (quoting England v. Astrue, 490 F.3d 1017, 1023 (8th Cir. 2007)).

The court has concluded that ALJ Kuperstein erred in his analysis of the treating physician opinion evidence and the lay testimony of Taylor and Vandewarker. All of that evidence is relevant to the RFC determination, which, in turn, is relevant to the availability of jobs. Therefore, if the RFC determination changes on remand, the ALJ should also revisit the evidence with respect to available jobs and gather additional evidence on the subject if needed.

### 5. Treatment Notes Alone Could Be "Substantial Evidence"

Taylor argues that ALJ Kuperstein's Decision was not supported by substantial evidence because "[h]e gave little weight to the opinions of the treating physicians; he gave very little weight to the opinions of the State Examiners; he gave little weight to the 'opinion' of the lay witness; he found the testimony of the plaintiff to be less than credible; and he ignored the inconvenient testimony of the VE that displays of explosive behavior in the work place would eliminate all employment." Pl.'s Mem. at 15–16. Taylor cited no authority to support this argument, and the court is aware of none.

Although the court has taken issue with the substance of much of ALJ Kuperstein's analysis, from a procedural perspective the law is clear that ALJ Kuperstein's decision could be supported by substantial evidence based on treatment notes alone. See Monroe v. Comm'r of Social Sec., 676 Fed. App'x 5, 8–9 (2d Cir.

2017) ("Because the ALJ reached her RFC determination based on Dr. Wolkoff's contemporaneous treatment notes—while at the same time rejecting his post hoc medical opinion ostensibly based on the observations memorialized in those notes—that determination was adequately supported by more than a mere scintilla of evidence."); Tankisi v. Comm'r of Soc. Sec., 521 Fed. App'x 29, 34 (2d Cir. 2013) (extensive medical record was sufficient to support ALJ's RFC determination despite lack of formal opinion evidence from treating physician). The court therefore disagrees with Taylor's contention that, purely by virtue of having rejected the medical opinion and lay witness evidence in the record, ALJ Kuperstein's opinion could not be supported by substantial evidence.

6. ALJ Kuperstein's Finding Re: Anxiety Disorder Was Supported by Substantial Evidence

In his Memorandum, Taylor states that ALJ Kuperstein's "omission of anxiety disorder from the list of severe impairments is troubling, as it's been documented by the clinical notes for years." Pl.'s Mem. at 9. Taylor also lists anxiety disorder as one of Taylor's severe impairments in his proposed stipulation of facts. Id. at 17. Those two references are the extent of Taylor's argument on this issue.

Given that it is not clear what argument Taylor is raising, and that Taylor has provided no support for it, the court reaches this issue only to note that ALJ Kuperstein's determination with respect to anxiety disorder appears to be supported by substantial evidence. For example, neither Dr. Louis-Jacques nor Dr. Jefee-Bahloul reference anxiety disorder in their medical opinion statements. Id. at 538; 604–06. While Taylor is correct that treatment notes reflect that Taylor has experienced anxiety for years, ALJ Kuperstein's Decision regarding anxiety disorder was nevertheless supported by more

than a mere scintilla of evidence.

**VI.     CONCLUSION**

For the foregoing reasons, Taylor's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is hereby **GRANTED** and the Commissioner's Motion to Affirm the Decision of the Commissioner (Doc. No. 16) is hereby **DENIED**.  The case is remanded to the Social Security Administration for further proceedings consistent with this Ruling.  The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the District Judge who issued the Ruling that remanded the case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 30th day of November, 2017.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge